# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1149 | **DATE** | 12/13/2002 |
| **CASE TITLE** | Fitch vs. Continental Casualty Co et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)    ☐ Local Rule 41.1    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** Pending motions (Docs 22-1 & 23-1) for summary judgment are granted in part and denied in part. Joint pretrial order to be filed on or before January 31, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | DEC 1 6 2002 | *41* |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| SCT | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT
02 DEC 13 PM 3: 26
FILED-JFM-JG

Date/time received in central Clerk's Office

mailing deputy initials

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHERI FITCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 01 C 1149 |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| an Illinois corporation; LARRY FINDER; and | ) | |
| ARCHEUS, INC., a New York corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on a motion for summary judgment brought by Defendant Continental Casualty Company and on a motion for summary judgment brought jointly by Defendants Larry Finder and Archeus, Inc. For the reasons stated below, we grant the motions for summary judgment in part and deny the motions in part.

## BACKGROUND

Plaintiff Cheri Fitch ("Fitch") began working as an underwriter for Defendant Continental Casualty Company ("CNA") on August 4, 1997 in its umbrella liability underwriting department. The department consisted of Fitch and co-workers Michael

Pellittieri ("Pellittieri"), Al Wano ("Wano"), and Tom Byrne, who was a manager. Fitch's immediate supervisor was John Pacheco ("Pacheco"). In December 1998 Fitch complained to Pacheco about Pellittieri and Wano, claiming that they were not doing their share of work and that Pellittieri made sexually offensive comments to her. On January 12, 1999, Pacheco called a meeting to address the tensions between Fitch and Pellittieri. At the meeting Pellittieri went on an angry tirade and yelled at Fitch. After the meeting Pacheco called Fitch at home to apologize for the inappropriate conduct of Pellittieri at the meeting and chastised Pellittieri for his behavior.

Fitch later told Amy Dixon ("Dixon") at Human Resources that she was experiencing panic attacks and had been having trouble sleeping since the January 12 meeting. On February 2, 1999, Fitch met with Dixon and Defendant Larry Finder ("Finder"), a professional counselor and president of CNA's Employee Assistance Plan ("EAP") provider, Archeus Inc. ("Archeus"), to discuss the problems between Fitch and Pellittieri and inform Fitch that counseling was available. In March 1999, Fitch was given a Performance Improvement Plan ("PIP") which, among other things, required Fitch to see a professional counselor. Fitch met with Finder to satisfy the PIP requirement, but was guarded and refused even to give her social security number. Pellittieri was not required to attend counseling.

Fitch continued to complain about Pellittieri's hostility and complain that Pellittieri and Wano were not doing their share of work. Fitch was also dissatisfied with the way that Pacheco was handling her complaints about Pellittieri. In October or November of 1999, Fitch called a CNA hotline for reporting employee misconduct and gave only her first name. In November 1999, Pacheco placed Fitch in another PIP which ordered Fitch to focus more on her job and to be more sensitive to CNA customer's needs. As a result of the PIP Fitch claims that her performance rating was lowered and she became ineligible for the annual bonus. Fitch also claims that she was unfairly forced to complete an underwriting guide without the assistance of Wano or Pellittieri. In December 1999, Fitch's underwriting authority was reduced; she was then required to get approval from her supervisor for certain decisions. Continental claims that the reduction was part of a new corporate strategy intended to reduce CNA's exposure and move CNA to a less aggressive market position. Fitch claims that she had requested a transfer to another position at CNA but that CNA refused to facilitate a transfer. Pacheco resigned on December 15, 1999 and Fitch resigned the next day.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole in a light most favorable to the non-moving party

and draw all reasonable inferences that favor the nonmoving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I. Constructive Discharge Claim

Title VII states that an employer cannot "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin . . .." 42 U.S.C. § 2000e-2(a)(1). However, an employee can successfully bring a Title VII claim even though he was never terminated by his employer if he can establish that he was constructively discharged. *Vitug v. Mulitistate Tax Commission*, 88 F.3d 506, 516-17 (7th Cir. 1996). *See also E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000) (indicating that 7th Circuit has not yet determined whether constructive discharge is appropriate in connection with an Americans with Disabilities Act ("ADA") claim). In order to establish a constructive discharge an employee must show that "his working conditions were so intolerable that a reasonable person would have been compelled to resign." *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (quoting *Rabinovitz v. Pena*, 89 F.32d 482, 489 (7th Cir. 1996)). For a constructive discharge the working conditions must be even worse than are necessary to constitute a hostile work environment, because in a hostile work environment the "employee is expected to remain employed while seeking redress."

- 5 -

*Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)). Generally situations that are merely "unpleasant" or "embarrassing" for the employee are not sufficient to render a work environment intolerable. *Simpson*, 196 F.3d at 877; *Rabinovitz*, 89 F.3d at 489 (stating that "an employee cannot be unreasonably sensitive to his working environment" and that there must be an "aggravating situation beyond ordinary discrimination"). The employee must also establish a nexus between the intolerable conditions and the unlawful discrimination, *Simpson*, 196 F.3d at 877, and that the employee's resignation was the only way he could avoid the intolerable work conditions. *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001). A plaintiff can also establish that he was constructively discharged by showing that the employer indicated to the plaintiff that he would definitely be terminated in the future. *E.E.O.C. v. Univ. of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002). In such an instance the plaintiff need not wait to be fired. *Id.*

Fitch claims that by December 1999 her working conditions were intolerable and thus she was constructively discharged when she resigned. Fitch does not claim that she was told she would be fired in the future. Fitch admits that Pellittieri did not make any further sexual comments after the January 12 meeting. Fitch's main complaint was that Pellittieri acted unprofessionally, and was either hostile towards her or ignored her.

She also claims that Pellittieri did not do his share of the work and that she was forced to complete an underwriting manual by herself. Also, Fitch complains that she was forced to seek counseling, she was denied a bonus, her work performance was criticized, her performance rating was lowered, and her underwriting authority was reduced.

Clearly Pellittieri and Fitch did not get along, but a reasonable person's employment is not rendered intolerable simply because she is not greeted with a smile each day by co-workers. A reasonable person cannot expect to get along with all co-workers all of the time and expect to be treated in a friendly manner at all times. Also, it is not uncommon for co-workers to develop grudges or feel slighted because of a belief that other workers are being given less work or the more desirable work. Fitch does not indicate any extreme behavior on the part of Pellittieri or Pacheco that could make a work environment intolerable. Fitch admits in her deposition that, other than the conflict with Pacheco and Pellittieri, she was happy with her job and that, if either Pacheco or Pellittieri had left her department, she would have continued in her job. As for the counseling, Fitch had indicated to persons at CNA that she was having trouble dealing with the conflict with Pellittieri and the counseling was ordered as part of an effort to help her. Fitch also complains that when her work performance was criticized by her supervisor, her underwriting authority was reduced. Criticism of an

employee's work by a supervisor is not unheard of and Fitch's salary was not reduced as a result of the reduction in her underwriting authority. Also, even if Fitch's performance rating was reduced and she was not given a bonus, which CNA disputes, our decision is not altered.

Based on the above, we find nothing more in this case than a commonplace dispute between co-workers who have personal animosity for each other. Fitch may not have been happy with her job at times and may not have had a perfect relationship with Pellittieri or Pacheco. She may have felt embarrassed if she was required to seek approval for decisions from her supervisor in situations where she did not have to do so before. However, when viewing the evidence in a light most favorable to Fitch, the conditions were not severe enough to constitute a constructive discharge. Fitch has not shown that a reasonable person would have been compelled to resign based on intolerable working conditions. We note that we have not mentioned the physical ailments that Fitch claims contributed to her resignation because the standard stated above asks us to determine whether the conditions were intolerable for a reasonable person, not whether the employee subjectively found them intolerable. Therefore, we grant CNA's motion for summary judgment on Fitch's constructive discharge claim.

## II. Retaliation Claim

Title VII prohibits an employer from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by this subchapter or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [the statute]." 42 U.S.C. § 2000e-3(a). To survive a motion for summary judgment, a plaintiff bringing a Title VII claim of retaliation can choose either the direct or indirect approach for showing the employer's retaliatory intent. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

Under the indirect method of proof, a plaintiff must make out a prima facie case that her employer retaliated against her. *Id.* To make out her prima facie case, the plaintiff must prove: "(1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* (citing *Stone v. City of Indianapolis Pub. Utils. Div., No.*, 2002 WL 234239, *1 (7th Cir. 2002)). If the plaintiff fails to establish any element of the prima facie case, summary judgment should be granted. *Id.* If the employee succeeds in establishing a prima facie case, the employer must present a "legitimate, non-invidious reason for the adverse employment

action." *Id.* Once the employer does so, the burden shifts back to the plaintiff to show that the reason advanced by the employer is pretextual. *Id.*. If the plaintiff cannot show that the reason is a pretext, the retaliation claim fails. *Id.* As Fitch does not claim that there is any direct evidence of retaliatory intent in this case, we turn to the indirect approach. There is no dispute by CNA as to whether Fitch was engaging in a statutorily protected activity. Also, although Fitch's performance was criticized in her second PIP, CNA has not argued that her overall performance was incompetent and thus an adverse employment action was justified. Rather CNA argues that there were not any adverse employment actions taken against Fitch.

## A. Whether there was a Materially Adverse Employment Action

While the Seventh Circuit defines an adverse employment action quite broadly, the adverse action at issue must still be material. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 885 (7th Cir. 1998). An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Also, simply because an employment action makes an employee unhappy, does not make the action an adverse employment action. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (stating that "minor" and "trivial" employment decisions that might irritate an overly sensitive employee would not constitute a materially adverse employment

action). Because of the unique circumstances in each case, there is no complete list of adverse employment actions and the employment action does not necessarily have to result in a loss of pay or benefits in order for it to be a materially adverse employment action. *Id.*; *Hilt-Dyson*, 282 F.3d at 465-66.

Fitch claims that she was forced to do the majority of the work on the underwriting guide without assistance. However, she has not indicated any special circumstances which would suggest that such an assignment constitutes a materially adverse employment action. Fitch also claims that the first PIP plan was disciplinary and thus adverse because she was required to see a counselor. We disagree. The PIP had no impact on Fitch's job rating or salary. Fitch had indicated to Human Resources that, since the January 12 meeting, she had been experiencing panic attacks and was unable to sleep at night. Thus, we agree with CNA's claim that the counseling was part of an effort to help Fitch. According to Fitch, there was also a materially adverse employment action when CNA failed to stop Pellittieri from ignoring Fitch at times and being hostile towards her at other times. There is no evidence that shows the hostility was sufficient to constitute an adverse employment action, even if it could be shown that CNA somehow ratified the conduct. *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (stating that where employee is ostracized and shunned by fellow employees there is not an adverse employment action).

Fitch also claims that Pacheco lowered her performance rating which made her ineligible for the annual bonus. However, a loss of a bonus is not an adverse employment action where the bonus is discretionary. *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996). Other than a statement of her own personal belief, Fitch has not provided evidence to show that employees at CNA were entitled to an annual bonus. Fitch also claims that CNA's denial of her transfer to other positions was an adverse employment action. However, although Fitch indicates that she applied for other positions at CNA and informed her superiors at CNA of a desire to transfer, she has not provided evidence that would reasonably indicate that anyone at CNA attempted to block a transfer in any way.

Fitch also claims that the criticisms of her work performance in the second PIP and the decision to reduce her performance rating to "unsatisfactory" were adverse employment actions. A negative employment evaluation or criticism by an employer is not by itself an adverse employment action, but it may, for example, constitute an adverse action if it results in a reduction of pay or job responsibilities. *See Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (stating that "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."). Fitch does not claim that the criticisms by Pacheco or the lowering of her performance rating affected her

employment in any way other than making her ineligible for the annual bonus, which as stated above, does not constitute an adverse employment action.

Finally, Fitch claims that the reduction in her underwriting authority constituted a material adverse employment action. Fitch's underwriting authority was reduced from $150,000,000 to $25,000,000. With the reduced authority, she was required to get approval from her supervisor on a regular basis, which slowed her work down and made it more difficult to provide efficient customer service. We think that this reduction is more than a mere trivial job alteration. A reasonable jury could find that it materially altered her job responsibilities and that it constituted a materially adverse employment action.

## B. Whether Fitch was Treated Less Favorably than Similarly Situated Employees

As stated above, to establish a prima facie case a plaintiff must also show that he was "treated less favorably than similarly situated employees who did not engage in a statutorily protected activity." *Hilt-Dyson*, 282 F.3d at 465. Employees are similarly situated when there is a "substantial similarity " between their positions, such as a common supervisor or similar standards governing their performance. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). In this case, Fitch was similarly situated with Wano and Pellittieri who were the other non-manager employees in her department. Considering the evidence in a light most favorable to

- 13 -

Fitch, a reasonable jury could find that her underwriting authority was reduced. Likewise, viewing the evidence in a light most favorable to Fitch we think that a reasonable jury might find that the authority of Wano and Pellittieri was not reduced at the time that Fitch's authority was reduced. CNA claims that Fitch has not provided any evidence to show that CNA did not reduce either Wano's authority or Pellittieri's authority. However, Pacheco was the supervisor of Wano and Pellittieri and thus should be aware of whether their authority was reduced. When asked if either Wano or Pellittieri's's authority was reduced at the time that Fitch's authority was reduced, he stated that he did not recall. (Pellittieri Dep. 146). When asked if he had done so that there would be a record similar to the authority letter sent to Fitch, Pellittieri responded that he "would presume that [he] gave something similar to Al and Mike even though [he] didn't recall it specifically." (Pellittieri Dep.147). Fitch made discovery requests which would have encompassed any such records and CNA has not produced any evidence showing that other employees in Fitch's department had their authority reduced at the time that CNA reduced Fitch's authority. Thus we think that the evidence sufficiently shows that Fitch was treated differently than similarly situated employees who did not engage in statutorily protected activity.

## C. Whether there was a Non-Discriminatory Reason that was not a Pretext

Having found that Fitch has established a prima facie case based on the lowering of her underwriting authority, we next turn to the issue of whether CNA has offered a legitimate non-discriminatory reason. CNA claims that the reduction was "intended to further a new corporate strategy that aimed to reduce CNA's exposure and move CNA to a less aggressive market position." The burden then shifts to Fitch to show that the reason is a pretext. A plaintiff can show a pretext by establishing either: 1) "a discriminatory reason more likely motivated the employer," or 2) the "employer's proffered explanation is unworthy of credence." *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994). In this case, as stated above, Fitch has produced sufficient evidence that a reasonable jury could find that her underwriting authority was reduced, but none of the other employees in her department had their authority reduced at that time. This runs contrary to CNA's claim of a corporate-wide strategy, and we think that it is sufficient evidence from which a reasonable jury could infer that CNA's proffered reason is unworthy of credence. Therefore we deny the motion for summary judgment of the retaliation claim to the extent that it relies on the adverse employment action of the reduction in Fitch's underwriting authority.

## III. Gender Discrimination Claim

Fitch also made a gender discrimination claim. CNA first points out that Fitch does not dispute that after the January 12, 1999 meeting Pellittieri never made any further sexually inappropriate comments. However, in her answer Fitch makes it clear that her gender claim is based solely on gender discrimination and is not intended to include claims of sexual harassment or hostile work environment. Fitch was the only woman in her department and was apparently the only employee whose underwriting authority was reduced. For the same reasons stated in connection with the retaliation claim, we deny the motion for summary judgment of the gender discrimination claim. *See Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998) (stating the elements for a prima facie case for a gender discrimination claim, which are the same as the elements stated in *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) for a retaliation claim).

## IV. ADA Claim

Fitch also claims that she was discriminated against because she was "regarded as" disabled by CNA and treated differently than employees not perceived as disabled. Specifically, Fitch claims that CNA management believed that she was mentally ill. Under the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a

record of such an impairment; or (C) *being regarded as having such an impairment.*" (Emphasis added). 42 U.S.C. § 12102(2). The purpose behind the "regarded as" definition is to protect individuals from adverse treatment based on the 'myths, fears and stereotypes' associated with disabilities." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (quoting *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489-90 (1999)). In assessing whether an employer regards an employee as having a major life activity affected, the court must determine whether the perceived impairment prevents the claimant from "perform[ing] the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Mack v. Great Dane Trailers*, 308 F.3d 776, 780-82 (7th Cir. 2002).

CNA makes two arguments against the ADA claim. First CNA claims that there was no adverse employment action against Fitch. Second CNA claims that there is no evidence that shows CNA perceived Fitch as disabled. As stated above, we think that there is sufficient evidence for a reasonable jury could find that there was an adverse employment action against Fitch. There were handwritten notes taken by Shelly Liapes ("Liapes") at a June 23, 1999 meeting with Rowley, Pacheco, Finder, Bob Keith, Liapes, and Nazneen Razi in attendance. (P. Statement of Facts Ex. 13). Although CNA claims that it is uncertain whether the notes were from the June 23 meeting, CNA's 56.1(b) response dealing with the alleged statements in the notes concerning

Fitch's mental health is not that the statements were not made at the meeting. Rather CNA argues that it was unclear who made the statements or if the statements were actually made. Also, in her deposition Liapes does not claim that the notes concerning opinions of Fitch's mental health were taken after the meeting. Liapes admitted, and CNA does not dispute in its 56.1(b) response, that references to "Larry" in the notes are a reference to Larry Finder who participated in the meeting by telephone. The meeting notes indicate that Finder, who was a licensed clinical professional counselor, stated that he thought that Fitch was mentally ill, that she could not control her impulses, and was not going to get any better. The notes also indicate that Finder made references to Fitch's "voice mails paranoia" and that Fitch "may not have the capacity to trust." The meeting notes also indicate that Pacheco stated that Fitch was paranoid. CNA's response to this evidence is that the notes may be inaccurate and not reflect what was actually stated at the meeting. Also, Liapes has herself admitted that she thought that Fitch was paranoid. (Liapes dep. 81).

The CNA opinions concerning Fitch's mental health are not limited to Fitch's ability to perform her specific job functions. Viewing the evidence in a light favorable to Fitch, the general opinion at CNA seems to have been that Fitch's paranoia and lack of control rendered her incapable of working with others. Interacting with co-workers or peaceful interaction with others in any context is an activity that is "central to most

- 18 -

people's daily lives" and therefore constitutes a major life activity. We think that, when considered in a light most favorable to Fitch, the evidence is sufficient to defeat a motion for summary judgment. Therefore, we deny the motion for summary judgment of the ADA claim (Count II).

## V. ADA and Illinois Act Confidentiality Requirements Claim

Fitch claims that CNA and Finder/Archeus violated provisions of the ADA and the Mental Health and Developmental Disabilities Confidentiality Act ("Mental Health Act") which prohibits unauthorized disclosure of an employee's medical information by an employer. *See* 42 U.S.C. § 12112(d)(3)(B); (4)(C); 704 ILCS 110/1 *et seq.* According to Fitch, confidential information regarding her mental state constituted medical information and was improperly intermingled with her regular personnel file. However, Fitch has provided no evidence that would indicate improper conduct on the part of CNA. Her only evidence is that she received, as part of discovery, a file from CNA which contained both the supposed medical information and her general personnel information. CNA claims that a paralegal copied the documents and placed them in one file when sending it to Fitch, and that Fitch's receipt of the information together in no way indicates that the documents were kept together at CNA. We agree.

Fitch also claims that CNA and Finder improperly disclosed confidential medical information. CNA first claims that the information in question was not medical

information. However, as stated above, the handwritten notes of the June 23, 1999 meeting show that Finder was a licensed clinical professional counselor, had met Fitch in a counseling session, and indicated at the meeting that Fitch might be mentally ill, that she could not control her impulses, and was not going to get any better. Also, in arguing against constructive discharge and an adverse employment action, CNA has claimed that the Finder counseling session was intended to help Fitch with her psychological problems. Under the ADA, supervisors and managers can only be told of necessary restrictions and accommodations that an employee may require. *See* 42 U.S.C. § 12112(d)(3)(B)(i); (4)(C). We think there is sufficient evidence that a reasonable jury could find that the Fitch's confidential medical information was not kept confidential. Therefore, we deny the motion for summary judgment of Counts III and IV.

## VI. Breach of Contract Claim against CNA

Fitch also brings a breach of contract claim against CNA. Fitch claims that an ethics guide distributed to CNA employees creates an implied contract that EAP communications will be kept confidential. Under Illinois law, an employee handbook can create an implied contract if: 1) there is a "statement clear enough that a reasonable person would believe that an offer has been made," 2) the statement is "disseminated to the employee in such a manner that the employee is aware of its

contents and reasonably believes it to be an offer," and 3) "the employee . . . accept[s]

the offer by commencing or continuing to work after learning of the policy statement."

*Border v. City of Crystal Lake*, 75 F.3d 270, 275 (7th Cir. 1996) (quoting *Duldulao v.*

*Saint Mary of Nazareth Hospital Center*, 505 N.E.2d 314, 318 (Ill. 1987)). In this case

a CNA ethics guide entitled "Our Commitment to Professional Conduct" states:

"[u]pon a report of misconduct, every effort will be made to protect your

confidentiality. If your identity must be revealed to correct the problem or to comply

with legal requirements, CNA will protect you from retaliation." The guide clearly

makes a promise to keep confidentiality that employees could construe as an offer.

CNA argues that, since the statement indicates that information may be released in

certain instances, the confidentiality is not absolute thereby precluding a contract. We

do not agree. The statement does not allow CNA to disclose information at will, but

only when necessary. Also, although the guide contains a statement denying the

creation of a contract, Fitch claims that the disclaimer was not conspicuous enough to

have its intended effect. *See Id.* at 274-75 (stating that disclaimer of promises in

employee handbook must be conspicuous). In the CNA guide the disclaimer is written

in small print at the bottom of a blank page at the end of the guide, which is hardly

conspicuous. The ethics guides were distributed to CNA employees. Fitch stated that

she was not certain, but she may have read the ethics guide, and Fitch continued to

work at CNA after the guide was distributed. Therefore, we deny the motion for summary judgment on the breach of contract claim against CNA (Count VI).

## VII. Fraudulent Misrepresentation Claim

Fitch also brings a fraudulent misrepresentation claim against CNA and Finder/Archeus based on alleged promises by Finder and CNA that calls to the "800" hotline for reporting employee misconduct and the counseling sessions would be confidential. CNA argues that Fitch cannot show actual reliance because she only gave her first name on the "800" hotline and she was guarded when speaking with Finder, refusing to give him her social security number. While those facts do indicate that there was not actual reliance, they are far from conclusive evidence. The fact that Fitch did call the hotline on her own and discussed her feelings about Pellittieri with Finder shows that she had some belief that the conversations were confidential. Therefore, we deny the motion for summary judgment of the fraudulent misrepresentation claim (Count V).

## VIII. Breach of Contract Claim against Finder and Archeus

Fitch has also brought a breach of contract claim against Finder and Archeus. Finder, the president of Archeus, stated in his deposition that he promised Fitch that their counseling conversation would be kept confidential except where disclosure was necessary. (Finder dep. 139). However, CNA paid a flat fee for Finder to handle all

employee counseling. Fitch has not shown any benefit received by Finder/Archeus from her that would constitute consideration to support a valid contract. Therefore, we grant the motion for summary judgment of the breach of contact claim against Finder/Archeus (Count VII). We note for clarification purposes that Fitch refers to the Finder/Archeus motion for summary judgment as dealing with Counts VI and VII and Finder/Archeus reiterates in its reply that their motion addressees Counts VI and VII. However, Count VI is not at issue in the briefs between Fitch and Finder/Archeus as it is a breach of contract claim against CNA rather than against Finder/Archeus. Thus, we do not grant the summary judgment motion for Count VI.

## CONCLUSION

Based on the foregoing analysis we grant the motion for summary judgment to the extent that the Title VII and ADA claims are based on a constructive discharge. We also grant the motion for summary judgment of the breach of contract claim against Finder and Archeus (Count VII). We deny the motion for summary judgment of the retaliation claim to the extent that it relies on the adverse employment action of the reduction in Fitch's underwriting authority. We also deny the motion for summary judgment of the gender discrimination claim (Count I), the ADA claim (Count II), the claims relating to disclosure of confidential medical information (Counts III and IV), the fraudulent misrepresentation claim (Count V), and the breach of contract claim

against CNA (Count VI). We also note that the Finder/Archeus motion for summary judgment did not encompass the breach of fiduciary duty claim in Count VIII.

_Charles P. Kocoras_

Charles P. Kocoras
Chief Judge
United States District Court

Dated: ___DEC 1 3 2002___